v. Frito-Lay North America, Inc. Well, the consumers of these goods know what the products are, and they perceive corn thins and rice thins as source identifiers. They talk about them and write about them as source identifiers. I would love to include your corn thins products in a goody bag for participants in a 10K run. I received your corn thins product in a race goody bag about two weeks ago, and I wanted to write and tell you that I really enjoyed your product. The first 300 people attending our event were thrilled to receive your corn thins product. We would love it if you would donate your great, incredible, vegan, gluten-free corn thins product. These are all spontaneous, unsolicited consumer testimonials written to my client through its site, expressing their understanding that corn thins and rice thins identify the source of these particular products. In addition, I believe the secondary meaning analysis of the board was short-circuited. So the narrow group is people who get free things? No. There are other consumers in the record who compliment the product without having received product samples, but I do think the product sampling efforts of my client have contributed to the secondary meaning that the marks have acquired. For example, one consumer refers to having gone on a camping trip, and she writes about how her daughter enjoyed the corn thins product on the trip. There are other citations at pages 29 to 30 of our response brief, and at pages 49 to 50, and at pages 9 to 12. At 46, you say that sampling, giving up free sampling, is a critical marketing vehicle enabling Real Foods to effectively reach its target consumer. What evidence is there in the record that sampling was critical to advertising your particular market? In the PELS declaration, and particularly at appendix 477, Michael PELS, the owner of Real Foods, talks about how to reach the target market of health-conscious people who are interested in gluten-free, GMO-free products, it's critical to distribute the product samples at natural food markets, and at health-oriented events, athletic events, and the like. Cite me to that page, please. 477 of the appendix. In its secondary meaning analysis, the board devoted only half a page to the issue, although Real Foods proffered 10 categories of evidence of secondary meaning. That's at page 45. The board failed entirely to weigh or even consider two categories of evidence. As we've discussed, there's the rare, unsolicited, direct evidence of consumer perception, which we submit is more than sufficient to establish secondary meaning by itself, even if the marks are found to be highly descriptive. Instead of considering this compelling direct evidence, however, the board instead considered a secondary meaning, which it said, quote, suffers because it included purchasers of crackers rather than purchasers of rice cakes and corn cakes. And that's at page 44 of the board's opinion. The board should have found this survey lacking. Give me the 477 and show me the use of the word critical, please. I don't have the record with me, Your Honor. I apologize. You don't? Apparently my co-counsel is not here. Sure, if you're opposing counsel, I'll be kind enough. Thank you. Thank you. You should apologize that the record was so large. Thank you very much, Bill. I appreciate it. Okay, so at paragraph 23 on appendix 477. Where's the word critical, please? Well, it relies primarily on grassroots marketing strategies, such as giving product samples to groups and individuals. So over half of its promotional budget, which is considerable, is devoted to product sampling. You're not answering my question. You are correct that it doesn't use the word critical here. So the board considered a survey, which it found it suffered because it included purchasers of crackers rather than purchasers of rice cakes and corn cakes, even though in prior decisions it has excluded such surveys because they polled the wrong consumers. For example, in the Sheets of Delaware case or in the Spirits International case. In fact, this survey, together with a consideration of third-party use of thins by itself, was the only basis for the court's ruling that the marks lacked secondary meaning. You can keep going. The board also stated that my client had done little to no advertising. Apart from not taking into account its promotional efforts in the digital space, nowhere does the board's opinion mention my client's significant promotional spending, which is in Appendix 5469. Finally, while not conceding on suggestiveness, I would submit that the board's decision on ruling that the marks were highly descriptive is at odds with every decision cited by either party on the issue. In those decisions, both this court and the board have established three hallmarks which a designation must possess in order to be highly descriptive. Extensive third-party use of the composite by competitors, disclaimers of the composites in trademark registrations, and applications for competing products or dictionary definitions of the composites. In this case, my client is the exclusive user of corn thins and rice thins in the United States. This is the board itself found on page 42 of its decision. And there are no dictionary definitions of either corn thins or rice thins, and there are no disclaimers in any third-party or my own client's applications of these terms. In evaluating the distinctiveness of a mark along the spectrum, this court always looks to the entire mark. And likewise, in evaluating whether a mark, the degree of descriptiveness of the mark, we submit that this court should look at the entire composite under its own and board precedent. Thank you very much. Good morning, Your Honor. I'd like to start with our cross-appeal and then I'll turn to you. Let me ask you about that. If we affirm the board on the descriptiveness issue, do we really need to reach the genericness issue? Well, I think you do, because if it's held to be merely descriptive, then it could potentially get onto the supplemental register, and it could potentially in the future get onto the principal register. Because it someday may acquire secondary meaning? Correct, which can change over time. Even though FINS itself is widely used throughout the snack food, cracker, every kind of product industry. Which is why we think it's generic. And if it's generic, it can never get on the supplemental register, and it can never get on the principal register, which is why we think it's important to have a definitive ruling. Why is the board wrong that even if FINS, and I think they recognize that it's completely generic as to snack foods, crackers, all kinds of other food products, it's not generic for specifically corn cakes and rice cakes? Well, one of the problems was the definition of the genus. Now, we agree that the genus is generally defined by the identification of goods, which was amended to popcorn cakes and rice cakes. But the record establishes that those categories of goods are subcategories of crackers, because they're types of crisps breads, and the record establishes that crisps breads are types of crackers. So if FINS is generic for crackers, and I think the record shows pretty definitively it is, then it's also generic for all subcategories of crackers, which would include rice cakes and popcorn cakes. Just like flour is generic for a broad category of plants. Well, flour is also generic for bluebonnets and daisies and roses. So the fact that FINS is generic for crackers means it's also generic for these specific types of products. As long as we assume they're crackers, as opposed to some kind of unique thing like rice cakes or corn cakes. They're clearly crisps breads, because that was the original identification of goods. There's definitions in the record that says that crisps bread slices are types of crackers, in the appendix at 60 and 94. And I think the board's decision, even though they argue that these are not crackers, I think the board's decision implicitly got that part right. The board's decision is confusing. It's a bit confusing. It's a finding of genericness, when it finds it's generic as to crackers, bread, snack products, basically everything in this food industry, and recognizes that these are a variant of crackers, but then yet doesn't find it generic for puffed rice cakes and puffed corn cakes. It wasn't crystal clear. I agree. But I think the record is clear that they found that FINS is generic for crackers. And so the issue again is, are pop corn cakes and rice cakes subcategories of crackers? Did they make that finding? It's implied, I think, because they go through extensively the record about all the third-party uses and generic uses of FINS for crackers and various other products. If they didn't specifically make that finding, then don't we have to send it back? That's what we're asking for. We're asking for the court to send the genericness issue back to the board. The other reason for that is because the board did make a finding that there wasn't sufficient showing by Frito-Lay that FINS is a generic term. And the only evidence they cited for that proposition was that the term FINS is used in other brand names, like Wheat Thins, Nabisco. That's the part that I find puzzling. What evidence would you put on that it's generic except other consumer goods? Is it because Brazen are trademark goods? Well, also other uses of FINS in blogs and in letters to the applicant where consumers in their reviews of the applicant's products use the term FINS in a generic manner. So it's not just in brand names like Wheat Thins and Vegetable Thins, but it's also in the text of blogs and websites where they use the term FINS all lowercase to refer to crackers or the applicant's own products. I just wanted to highlight that this issue that the board relied on the fact that the term FINS is used in other brand names, that should support a finding of genericness, not defeat it. And this court, in its recent decision in the Coke Zero case, that's exactly what the court said. The fact that Zero is used in multiple brand names by multiple companies, like Coke Zero, Pure Zero was RC Cola's product, and various other third parties use Zero in the product name for soft drinks, the board said that is competent evidence of genericness. So they vacated the board's decision that Zero is not generic and sent it back to the board. So just like Zero is used in multiple brand names, the term FINS is used in multiple brand names. And again, also used as a generic term in text. A couple of things I want to say about the genus that supports the fact that popcorn cakes and rice cakes are types of crackers. There are, and you asked about did the board make a finding of that, the closest there is the board did say that when they granted the applicant's motion to amend, they pointed out that Frito-Lay, we had conceded, that the record indisputably shows that popcorn cakes and rice cakes are kind of crisp bread, and thus kinds of crackers. Additionally, the applicant touts its products as either crackers or alternatives to crackers. The other thing is I think they implicitly admit that crackers are relevant because they're relying on registrations of marks that include the word FINS and cover crackers, but the word FINS isn't disclaimed. They're saying that's relevant and that's evidence that FINS is not generic. Well, if those registrations covering crackers are relevant, then so is our evidence showing generic use of the term FINS for crackers. So for all of those reasons, we're asking the court to remand the generic decision back to the board so the board can properly analyze and consider the genericness of these marks as a whole, given that both terms, corn and FINS, and rice and FINS are generic individually. I have to tell you, counsel, that when I looked at your cross-appeal, I concluded that no harm, no foul, that you didn't have standing, but you made a persuasive argument on the potential harm. Thank you, Your Honor. Turning to the applicant's appeal, of course, the board's findings that these marks are highly descriptive and that they lack acquired distinctiveness, those are purely factual findings that are subject to this court's substantial evidence review. The applicant's argument is that these marks are double entendres. That issue was specifically considered and rejected by the board. That is another factual finding that's entitled to deferential review. But just a couple of other things about this double entendre issue. The cases the applicant cites illustrate usually the pretty obvious distinction between a double entendre and a descriptive mark. For example, Polly Pitcher from the Second Circuit. That was found to be a play on the historical figure Molly Pitcher. Sugar and Spice from the CCPA. That was found to be a play on the nursery rhyme, sugar and spice and everything nice. In stark contrast, the terms corn FINS and rice FINS have no catchy or incongruous meaning. To the contrary, they directly describe the main ingredient of the product and the shape of the product. The applicant claims that the term FINS has a second meaning. That is, if you eat these products, it will help thin you. But they haven't identified a single ad in the record where they use the term FINS in that manner. As the board found, the record is devoid of any evidence that consumers understand that the term FINS in their mark has that second meaning. The board's finding that these marks are not double entendres and, to the contrary, are highly descriptive marks is a factual finding that has substantial evidence supporting it. Finally, turning to the secondary meaning issue, because these terms are highly descriptive, the applicant has a very heavy burden to establish that they have acquired distinctiveness. The board found that the applicant failed to carry that burden. Another purely factual issue that the board found in our favor. The applicant tries to overcome those findings by, again, recasting the identifications of goods in its applications. This time, by trying to limit the channels of trade. They say, we only sell these products in a niche market to consumers that are interested in natural, organic, healthy, wholesome and GMO-free foods sold in natural foods markets. The applications do not say any of that. They don't include any limitation on channels of trade or types of consumer. None of the cases that the applicant cites on this point that relate where a court has found secondary meaning in a niche market, none of those cases are in the context of where an applicant is seeking an unrestricted federal registration like the applicant is doing here. All of those cases that they cited are in the context of a trademark owner asserting common law trademark rights or trade risk rights only in a niche market. That's a very different situation than here where they're trying to get nationwide registration rights with an unrestricted identification of goods. Finally, even if the applications were limited to some niche market, the board found that the applicants' sales and promotional activities in those markets have been limited. The applicant claims that it has a dominant or top share in these niche markets, but the evidence that it cites for that proposition does not support it. The market data that they're relying on shows that even in those narrow markets, its sales are dwarfed by other players like Quaker and Lundberg. For example, Quaker sales are almost 20 times as large as real foods, and Lundberg's was over five times as large, even in those niche markets. There's another study in the record that studied brand awareness. Again, the brand awareness of corn thins was dwarfed by Quaker and was characterized as low, even among second-tier brands. In addition, the applicant points to a handful of consumer blogs and YouTube videos that have reviewed its product, and by handful, I'm talking about less than 20. This is a product that's been sold in the United States for 18 years, so that's not a whole lot of reviews for a product that's been sold that long. If you look at those blogs, they use the term corn thins and thins generically, all lowercase, even within a blog, a review about the applicant's own product. Finally, the applicant points to a Google search on the term corn thins that mostly returned results relating to the applicant. Well, that's hardly surprising, given that they're the only ones that are using or attempting to use corn thins as a brand name. You're into your rebuttal time. Okay. Up to you. Okay. I just want to mention on the Google search, as the board found, several of the websites that were revealed in this Google search, again, used the term corn thins in all lowercase generically. Of course, the applicant doesn't even talk about what a Google search on the term rice thins would reveal. We're asking the court to do two things. Number one, affirm the board's factual findings on descriptiveness and lack of distinctiveness and vacate and remand the board's decision on genericness. Thank you. Thank you, counsel. On genericness, the board got it right, because they looked at the direct evidence of consumer perception of corn thins in its entirety and rice thins in its entirety. Beginning at page 30, they looked at these specific emails. And by the way, there are many in the record, more than 40 individual instances are cited in the briefs alone. There are additional ones in the record. And it concluded that these emails demonstrated direct consumer understanding of a single source of the goods, that they were consistent with awareness of a single source, and these were the emails that Frito-Lay relied upon, not all of them. And if you look at the substance of the emails, consumers don't punctuate like trademark lawyers, and they don't always capitalize the C and the T, or sometimes they'll capitalize it one time and not another time. But if you look at the substance of the emails, they all indicate source awareness. And as a result, the genericness decision is the one part of the decision where the board is looking at direct evidence of consumer perception, which is reflected in the market share report. And by the way, Frito-Lay's sales are minuscule in the natural foods market. Thank you, counsel. You're welcome. I just want to make crystal clear that the error we are pointing to in the board's decision on genericness was its conclusion that the term Thins individually is not generic, or that we hadn't presented it, that it was a mixed record or whatever. That conclusion was erroneous because the only thing the board relied on was the fact that Thins is used in brand names of other companies, Wheat Thins, Vegetable Thins, Seth's Mark Thins. And that part of the board's analysis was erroneous. So it needs to be vacated so that they can properly consider the analysis of the marks as a whole and using that as a first step in the analysis. Thank you. Thank you, counsel. The matter will stand submitted.